UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAMEL SANDERS and ANTERO SARREAL, on behalf of themselves and all others similarly situated,<br><br>                          Plaintiffs,<br><br>             *-against-*<br><br>HOUSLANGER AND ASSOCIATES, PLLC; TODD E. HOUSLANGER; VIRGO CAPITAL, LLC; AQUARIUS CAPITAL, LLC; and DOE COMPANIES 1-10.<br><br>                         Defendants. | No. 17 Civ. 8985<br><br>**CLASS ACTION COMPLAINT AND JURY DEMAND** |

Plaintiffs Ramel Sanders and Antero Sarreal, on behalf of themselves and all others similarly situated, allege as follows:

## INTRODUCTION

1.       Plaintiffs are consumers who are suffering from continued collections from the same judgments challenged as fraudulent in *Sykes, et al. v. Mel S. Harris and Associates, LLC, et al.*, 09 Civ. 8486 (S.D.N.Y.).  *Sykes* ended in a class action settlement where, for a vast majority of class members, the *Sykes* defendants stopped collecting on their judgments and a New York state court later vacated the outstanding judgments.  But approximately 25,000 *Sykes* class members did not have collections stopped or their judgments vacated because the *Sykes* defendants sold those judgments to third-party debt buyers before settling *Sykes*.  This action is brought on behalf of those *Sykes* class members who are suffering from continuing collections on LR Credit judgments by Defendants in this action.

2.      The Complaint in *Sykes* alleged that Leucadia National Corporation ("Leucadia") and a New York law firm known as Mel S. Harris and Associates LLC (the "Mel Harris Firm") engaged in a scheme to obtain default judgments against people by filing false affidavits of merit and service in state court and then to use those fraudulently obtained judgments to extract money from them. These judgments collectively are known as the "LR Credit Judgments."

3.      In 2012, the federal district court certified the *Sykes* class. In so doing, the court found that "every potential class member's claim arises out of defendants' uniform, widespread practice of filing automatically-generated, form affidavits of merit based on 'personal knowledge' and, in many instances, affidavits of service, to obtain default judgments against debtors in state court." *Id.* at 293. With respect to the affidavits of merit, the court found specifically that "Fabacher sign[ed] hundreds of affidavits a week, purportedly based on personal knowledge, purporting to certify that the action has merit, without actually having reviewed any credit agreements, promissory notes, or underlying documents, and, indeed, without even reading what he was signing." *Sykes*, 285 F.R.D. at 285.

4.      Following class certification, the parties settled the *Sykes* lawsuit. As part of the settlement, the *Sykes* defendants agreed to stop all collections and to cooperate in the *Sykes* plaintiffs' efforts to secure vacatur of the LR Credit Judgments in state court. The *Sykes* defendants stipulated as part of the settlement that all defendants in debt collection actions brought by LR Credit in New York would have been entitled to interpose a defense predicated upon "fraud, misrepresentation, illegality, unconscionability, lack of due service, violations of law, or other illegalities."

5.      Before the class settlement, LR Credit sold approximately 25,000 judgments to various third parties (collectively, the Sold Judgments).

6.      Following final approval of the class settlement, the New York State Attorney General brought a CPLR 5015(c) proceeding in New York Supreme Court on behalf of Deputy Chief Administrative Judge Fern Fisher to vacate *all* judgments obtained by LR Credit.  While the Court initially vacated all LR Credit Judgments, including the Sold Judgments, the Court amended its order on July 20, 2017, to exclude the Sold Judgments.

7.      Defendants in this action are holders and collectors of the majority of these Sold Judgments. Despite being fully aware of the unlawful circumstances under which the LR Credit Judgments were obtained, Defendants continue every day to garnish people's wages and freeze their bank accounts in execution of the fraudulently obtained judgments.

8.      Accordingly, Plaintiffs bring this class action, on behalf of themselves and those similarly situated who are members of the Sykes Class whose Sold Judgments have been subjected to execution activity by the Defendants in this action.

9.      Plaintiffs seek actual and statutory damages pursuant to the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, the New York unfair and deceptive practices act statute codified at N.Y. Gen. Bus. Law § 349 ("GBL 349"), and § 487 of the New York Judiciary Law ("JL 487").

## PARTIES

10.      Plaintiff Ramel Sanders is a natural person who resides in Manhattan, NY.

11.      Plaintiff Antero Sarreal is a natural person who resides in Queens, NY.

12.      Mr. Sanders and Mr. Sarreal are each "consumers" as defined in 15 U.S.C. § 1692a(3).

13.      Defendant Houslanger & Associates, PLLC ("Houslanger Firm") is a New York Professional Service Limited Liability Company with a principal place of business at 372 New

York Avenue, Huntington, NY 11743. The Houslanger Firm also maintains an office at 243

Route 100, Floor 2, Somers, NY 10589. The Houslanger Firm shares office space, a telephone

number, and personnel with Defendants Virgo and Aquarius.  The Houslanger Firm's Director of

Recovery Operations, Matthew Blake, is also the managing agent of Defendants Virgo and

Aquarius; Mr. Blake is also an owner, partner or corporate officer of Defendant Virgo.  The

Houslanger Firm is licensed as a debt collection agency with the New York City Department of

Consumer Affairs. The Houslanger Firm is a debt collector; the principal purpose of its business

is the collection of debts, and it regularly collects or attempts to collect debts owed or due or

asserted to be owed or due another, using the means of interstate commerce such as telephone,

mail, wire transfers, and the internet. The Houslanger Firm collects debts from people in this

district.

14.     Defendant Todd Houslanger ("Houslanger") is a natural person who is a member,

owner and operator of the Houslanger Firm. Houslanger personally oversees, manages, and is

ultimately responsible for the debt collection business of the Houslanger Firm, including its

collection of the Sold Judgments. Houslanger regularly collects or attempts to collect debts owed

or due or asserted to be owed or due another, using the means of interstate commerce such as

telephone, mail, wire transfers, and the internet.  Houslanger collects debts from people in this

district.

15.     Together, the Houslanger Firm and Houslanger are called the "Houslanger

Defendants."

16.     Defendant Virgo Capital LLC ("Virgo") is a New York Limited Liability

Company with a principal place of business at 243 Route 100, Somers, New York 10589. Virgo

is licensed as a debt collection agency with the New York City Department of Consumer Affairs.

4

Virgo is a debt buyer, and its principal business is buying and collecting defaulted debt, which it accomplishes by use of the means of interstate commerce, such as telephone, mail, wire transfers, and the internet. Virgo collects debts from people in this district.

17.    Defendant Aquarius Capital, LLC ("Aquarius") is a New York Limited Liability Company with a principal place of business at 243 Route 100, Floor 2, Somers, NY 10589. Aquarius's agent for service of process is Defendant Houslanger & Associates PLLC, 372 New York Avenue, Huntington, New York 11743. Aquarius is licensed as a debt collection agency with the New York City Department of Consumer Affairs. Aquarius is a debt buyer, and its principal business is buying and collecting defaulted debt, which it accomplishes by use of the means of interstate commerce, such as telephone, mail, wire transfers, and the internet. Aquarius collects debts from people in this district.

18.    Doe Companies 1-10 are debt-buying entities whose names are currently unknown, but who are current owners of Sold Judgments and have retained the Houslanger Defendants for collection of those judgments.

19.    Each and every defendant is a "debt collector" as defined in 15 U.S.C. § 1692a(6).

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d) and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

21.    Venue is proper in this District pursuant to pursuant to 28 U.S.C. § 1391.

## FACTS

**A. The Fraudulent Debt Collection Scheme**

22.     In 2004, Leucadia National Corporation ("Leucadia"), a multi-million dollar publicly traded corporation, and a New York law firm known as Mel S. Harris and Associates LLC ("Mel Harris Firm"), formed a joint venture to collect alleged defaulted consumer debts via lawsuits filed in the New York courts.  The scheme worked as follows:

23.     Leucadia and the Mel Harris Firm formed a series of New York limited liability companies called LR Credit LLC, LR Credit 2 LLC, and so forth.

24.     Each LR Credit company purchased, for pennies on the dollar, one or more portfolios of alleged defaulted consumer debts.

25.     The debt portfolios consisted of spreadsheets containing the names, addresses, and social security numbers of people who allegedly owed money on defaulted consumer debts, such as credit cards, along with the amounts each person supposedly owed.

26.     The debt portfolios did not include the original credit agreements, nor did they include account statements or any other documentation that could be used to verify the accuracy of the data in the spreadsheets.

27.     Many times, such account documentation simply did not exist or could not be obtained by the Mel Harris Firm or LR Credit even upon specific request to the assignor of the portfolio.

28.     Moreover, the contracts of sale that accompanied the debt portfolios specifically disclaimed the accuracy of the spreadsheets.

29.     The Mel Harris Firm and LR Credit primarily collected debts by filing lawsuits against the people named in the spreadsheets and obtaining judgments against them. In the lawsuits, the Mel Harris Firm was the attorney and an LR Credit company was the plaintiff. The Mel Harris Firm collected on the judgments by freezing people's bank accounts, seizing their

money and wages, and intimidating people into making "voluntary" payment agreements. The two companies divided between them the money that they received.

30.     Because the Mel Harris Firm and LR Credit did not have and could not possibly obtain proof that any particular person sued actually owed a debt, they could not win judgments in contested cases. Therefore, they concocted a scheme that allowed them to win uncontested default judgments.

31.     At the time, New York law provided that courts would issue default judgments upon the application of the plaintiff when the person sued failed to appear. In order to award the default judgments, New York law required two pieces of paper:  an affidavit of service, attesting to service of process upon the person sued, and an affidavit of merit, attesting to all of the essential elements of the cause of action (in these cases, that there was a contract, the contract was breached, account statements had been sent to the defendant, and a certain amount of money was owed).

32.     In order to ensure that the people sued would not appear and defend themselves, the Mel Harris Firm and LR Credit hired process serving companies that regularly engaged in "sewer service" – the practice of failing to deliver process to the person sued and then filing a false affidavit of service with the court falsely stating that the person sued had been served when they had not.

33.     In order to obtain the default judgments, along with false affidavits of service, the Mel Harris Firm and LR Credit filed false affidavits of merit.

34.     These affidavits of merit were all signed by a person named Todd Fabacher, who worked in the Mel Harris Firm's Information Technology Department and claimed to be "an authorized and designated custodian of records" for each of the accounts.

35.     In these affidavits, Fabacher claimed to be "fully and personally familiar with, and have personal knowledge of, the facts and proceedings relating to the within action."

36.     New York law requires affidavits of merit to be made on personal knowledge, and no default judgment can be awarded without an affidavit of merit made on personal knowledge.

37.     Though he professed to have personal knowledge that the people sued owed a debt, in fact Fabacher had no such knowledge in any case, nor would it have been possible for him to obtain such knowledge because the Mel Harris Firm did not have access to documentation that could be used to verify the statements in the affidavits.

38.     Fabacher's affidavits of merit were uniformly false.

39.     Over a ten-year period, The Mel Harris Firm and LR Credit obtained approximately 200,000 default judgments against low-income New Yorkers. All of these judgments were awarded on the basis of false affidavits of merit, and many also involved false affidavits of service.

40.     Armed with the fraudulently obtained judgments, the Mel Harris Firm and LR Credit extracted more than $100,000,000 from low-income New Yorkers. The judgments also appeared on people's credit reports, preventing them from obtaining housing, employment, insurance, and affordable credit.

**B.  The *Sykes* Litigation**

41.     In 2009, Monique Sykes and other individuals filed a federal class action lawsuit against the Mel Harris Firm and its principals, Leucadia and the LR Credit companies and their principals, and a process serving company, Samserv, Inc., its principal and some of its process servers.

42.    The lawsuit, known as *Sykes v. Mel Harris*, alleged the fraudulent scheme described above and claimed violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), New York General Business Law § 349, and New York Judiciary Law § 487.

43.    On December 29, 2010, the federal district court denied defendants' motion to dismiss, holding that the *Sykes* complaint stated claims under all of these statutes.

44.    In April 2011, the *Sykes* plaintiffs filed their motion for class certification supported by the following evidence: (1) sworn testimony from Todd Fabacher attesting that he signed each affidavit of merit purely on the basis that data printed on every fiftieth affidavit matched information in the Mel Harris Firm's computer system (which contained fields only for name, contact information, SSN, original creditor and amount allegedly owed); and (2) sworn testimony detailing numerous instances of documented sewer service contained within defendants' electronic records, which provided "substantial support for plaintiffs' assertion that defendants regularly engaged in sewer service." *Id.* at 284.

45.    Furthermore, the class certification briefing and supporting documents established that the individual process server defendants had lost or destroyed all of their logbooks pertaining to service on *Sykes* class members and had no particular memory of serving any particular class member. Because of the destruction of the logbooks, it is impossible to prove that those *Sykes* class members were validly served; no such evidence exists or could possibly be discovered.

46.    On September 4, 2012, the federal district court granted the *Sykes* plaintiffs' motion for class certification.

47.     As part of its decision certifying the *Sykes* class, the federal district court made

certain factual findings as necessary to determine that the class members had common claims.

Specifically, the court found that Fabacher signed the affidavits of merit "purportedly based on

personal knowledge, purporting to certify that the action has merit, without actually having

reviewed any credit agreements, promissory notes, or underlying documents, and, indeed,

without even reading what he was signing." *Sykes*, 285 F.R.D. at 285. Further, the district court

found "substantial support for plaintiffs' assertion that defendants regularly engaged in sewer

service." *id.* at 284, as part of a "unitary course of conduct, that is, fraudulently procuring default

judgments." *Id.* at 290.

48.     Defendants sought interlocutory appeal, and the Second Court affirmed the

district court's decision on February 10, 2015.  *Sykes v. Mel S. Harris & Assoc. LLC*, 780 F.3d

70 (2d Cir. 2015).

49.     The *Sykes* parties reached a settlement.  As part of the settlement, the *Sykes*

defendants agreed to stop all collections on the LR Credit accounts and judgments they owned,

to transfer all of the accounts they owned to the non-profit entity, Rolling Jubilee, and to

cooperate in the *Sykes* plaintiffs' efforts to secure vacatur in state court of all judgments obtained

by LR Credit.

50.     The *Sykes* defendants stipulated as part of the settlement that all defendants in

debt collection actions brought by LR Credit in New York "would have been entitled to

interpose a defense predicated upon fraud, misrepresentation, illegality, unconscionability, lack

of due service, violations of law, or other illegalities."

51.     The court-approved notice sent to *Sykes* class members with Sold Judgments

stated "[T]he company that bought your debt from LR Credit is not released" and "The

Settlement does not affect your right to bring a lawsuit against the company that bought your

debt from LR Credit."

### C. The Sold Judgments

52.    According to LR Credit's records, between August 2006 and April 2012, LR

Credit sold approximately 25,000 judgments to nine different debt buyers.  Specifically,

according to LR Credit's records, it sold:

   a.   1,258 judgments to "Great Seneca" in August, 2006[1];

   b.   7,114 judgments to "Sherman" between December 2006 and March 2008;

   c.   5 judgments to "Jackson" between November 2006 and June 2010;

   d.   474 judgments to "Gotham" in December 2009;

   e.   14,813 judgments to "Virgo" in January 2012;

   f.   2,089 judgments to "HKR" and "HKR (Replacements)" in April 2012.

53.    The purchasers of the Sold Judgments were not parties to the *Sykes* litigation or

settlement.

54.    After the filing of the *Sykes* litigation, on information and belief, the earliest

purchasers of the Sold Judgments, Great Seneca and Sherman, resold the Sold Judgments they

allegedly owned to other debt buying entities including Aquarius and Doe Companies 1-10.

55.    Defendant Virgo and the Doe Companies 1-10 purchased Sold Judgments after

Plaintiffs had filed their motion for class certification, at a time when evidence in support of

Plaintiffs' claims was available in the public record.

---

[1] Plaintiffs believe these records refer to a third party debt buying entity called "Great Seneca Financial
Corporation," which dissolved in 2009.

56.    On information and belief, some current holders of Sold Judgments, including the Doe Companies 1-10, even acquired those judgments after the federal court approved the *Sykes* class action settlement.

57.    On information and belief, Defendant Houslanger closely followed the *Sykes* litigation over the years and was well aware of the *Sykes* plaintiffs' allegations and the various decisions issued by the District Court and the Second Circuit.

58.    Because the Sold Judgments were obtained in the exact same manner as all the other LR Credit Judgments, they are as compromised by fraud, misrepresentation or other misconduct as all of the other LR Credit Judgments.

**D.    The CPLR 5015(c) Proceeding and Attempted Intervention by *Sykes* Class Members**

59.    On November 28, 2016, Deputy Chief Administrative Judge Fern A. Fisher, represented by the New York State Attorney General, filed a special proceeding under CPLR Rule 5015(c) to vacate every judgment obtained by the LR Credit entities, including judgments subsequently sold, on the grounds that each judgment debtor would be uniformly entitled to interpose a defense such as fraud, misrepresentation, illegality, unconscionability, or lack of due service.

60.    The Petition explicitly included all judgments LR Credit owned at the time of settlement, including the Sold Judgments.  While the Attorney General provided direct notice of the Petition to LR Credit and Rolling Jubilee, it explained that it would be "impractical to name all such parties [i.e. parties that now hold the Sold Judgments] as respondents in this case, especially as they appear sometimes to have failed to update court records to substitute themselves as plaintiffs for the LR Creditor involved." *Id.* The Attorney General further explained that "the LR Creditors are best positioned to know the circumstances under which

these judgments were obtained and whether, for instance, false affidavits of merit were filed by their agent."

61.    The state court granted the relief sought by the Attorney General on May 2, 2017, stating that Petitioner's "petition seeking to vacate and set aside *all default judgments obtained by Respondents* Leucadia National Corp., L-Credit, LLC, LR Credit, LLC, and LR Credit 1-23 against consumers in the State of New York and to stay all marshals and/or sheriffs who hold executions under such judgments from executing to collect such judgments is granted without objection."

62.    To effectuate its Order, the state court ordered vacated all default judgments listed on an attached exhibit and ordered execution of those judgments stayed.

63.    On May 9, 2017, the Attorney General submitted a letter and an "updated" judgment list, "deleting some judgments included as a result of clerical error and making other corrections" ("May 9 List"). The May 9 List omitted approximately 14,813 judgments that the *Sykes* defendants' records list as having been sold to "Virgo."

64.    Counsel for the *Sykes* class (the same attorneys who represent Plaintiffs in this action), by letter dated May 12, 2017, challenged the Attorney General's May 9 request, and argued that no change should be made to the vacatur order because those 15,000 people were entitled to relief from their judgments.

65.    The Attorney General, by letter dated May 15, 2017, stated that it was "approached by counsel representing Virgo" and, as a result, sought the reinstatement of those judgments because it was seeking to "maintain the status quo" while negotiations took place with Virgo.  Dkt. 21.

66.    Defendant Houslanger was the "counsel representing Virgo."

67.    Prior to a hearing concerning the Attorney General's request, two *Sykes* class members sought to intervene in the 5015(c) proceeding on behalf of all class members with Sold Judgments to argue that, since all LR Credit Judgments were obtained on the basis of the same fraudulent affidavits of merit, class members with Sold Judgments were equally as entitled to relief as class members whose judgments were not sold.

68.    The state court, however, rejected the motion to intervene as untimely, holding that the CPLR 5015(c) proceeding had ended. The state court kept its initial order in place but ordered the Attorney General to submit a new list of vacated judgments thirty days excluding all Sold Judgments from vacatur under 5015(c).

69.    On July 10, 2017, the Attorney General submitted a new list of vacated judgments without the Sold Judgments.

70.    On July 20, 2017, the state court entered an order vacating all default judgments listed in the July 10, 2017 list of vacated judgments.

**E.  Ongoing Collection of LR Credit Judgments**

71.    Defendants in this action, as holders and collectors of the Sold Judgments, continue to garnish people's wages and restrain their bank accounts in enforcement of the fraudulently obtained judgments.

72.    On information and belief, Defendants take such action without having notified class members of the assignment of the judgments to a new entity.

73.    Defendants take such enforcement action in full knowledge of the fraudulent nature of the judgments.

74.    Defendants are not in possession of any evidence establishing that any *Sykes* class member was in fact served with process, nor could they possibly obtain such evidence.

14

75.    When *Sykes* class members seek to vacate the fraudulent judgments, Defendants actively oppose those efforts by filing affirmations in opposition that contain blatant misrepresentations, described in more detail below. On information and belief, Defendants make the same misrepresentations in every case.

76.    Prior to taking action to enforce the judgments and/or filing affirmations in opposition, Defendants do not review the files of *Sykes* class members to determine whether the judgments were entered based on false affidavits of merit, false affidavits of service, and/or whether the judgment debtors received actual notice of the assignments.

77.    Defendants have taken the position that they have no obligation to review class members' files prior to enforcing or opposing vacatur of the judgments.

78.    Defendants have taken the position that they are entitled to collect on the Sold Judgments *even though they were fraudulently obtained*, simply because the judgments have not yet been vacated.

## INDIVIDUAL PLAINTIFF FACTS

### *Ramel Sanders*

79.    Plaintiff Sanders is a 38-year-old Manhattan resident and father of three who works full time for Costco in Member Services.

80.    On January 26, 2007, LR Credit obtained a judgment against Mr. Sanders in the amount of $1,432.11.

81.    Mr. Sanders was never served with any documents in the case and received no notice of the lawsuit or judgment.

82.    Process server Angelo Rivera from Samserv filed an Affidavit of Service falsely stating that he had served Mr. Sanders by delivering the summons and complaint to an individual

of suitable age and discretion named "MR. SANDERS" and described as 36-50 years old, weighing more than 200 pounds, with brown hair, brown skin and a mustache, and by subsequently mailing the court papers to him. Mr. Sanders does not know anyone of that description who would have been at his residence at the time of alleged service. The only people named "Mr. Sanders" that Mr. Sanders knows are himself and his brother, and neither of them match the description provided by the process server, nor were Mr. Sanders or his brother ever served with process. Mr. Sanders never received process at his home or in the mail.

83.     After Mr. Sanders did not appear in court, LR Credit moved for a default judgment, supported by an affidavit of merit signed by Todd Fabacher.  In the affidavit, Fabacher falsely claimed personal knowledge that Mr. Sanders owed a debt to Sears.

84.     Mr. Sanders has never had a credit card or account of any kind at Sears and cannot recall ever having shopped at Sears.

85.     LR Credit's records list Mr. Sanders' judgment as sold to "Virgo" on January 4, 2012.

86.     Neither LR Credit, Virgo, nor Houslanger ever notified Mr. Sanders of the sale or assignment of the judgment.

87.     Virgo failed to notify the court of the change in judgment creditor and provide proof of its entitlement to enforce the LR Credit judgment as required by CPLR 5019(c).

88.     Mr. Sanders was never served with any documents and received no notice of the lawsuit that resulted in a default judgment being entered against him until approximately early December 2016, when he received a notice of wage garnishment initiated by the Houslanger Defendants.

89.     After receiving the wage garnishment, Mr. Sanders called the Houslanger Firm and stated that he had never had an account with Sears.

90.     Thereafter, Mr. Sanders received an identity theft affidavit from the Houslanger Firm, which he filled out and mailed back twice.

91.     The Houslanger Firm continued to pressure Mr. Sander to make payments and claimed that it never received Mr. Sanders; identity theft affidavit.

92.     On or about April 4, 2017, Mr. Sanders went to court and filed a *pro se* order to show cause seeking to vacate the default judgment.  In his affidavit in support, he explained that he was never served. He also stated that he had never had an account or credit card with Sears.

93.     On or about April 21, 2017, Defendant Houslanger filed an Affirmation in Opposition to Order to Show Cause ("Affirmation") which contains multiple deceptive statements.

94.     In paragraph 2 of the Affirmation, Houslanger stated: "Upon information and belief, the Defendant was properly served in this matter and the Court has obtained jurisdiction over  . . . the person of the Defendant."

95.     Houslanger could not possibly have formed a basis to believe that Mr. Sanders was properly served because he did not have and did not review a copy of the Affidavit of Service.  Houslanger did know, however, that a federal district court had already determined that many of the LR Credit judgments were obtained by sewer service.

96.     In paragraph 8 of the Affirmation, Houslanger stated that the garnishment "resulted from the proper execution of a judgment of this Court, lawfully obtained."

97.    And in paragraph 9 of the Affirmation, Houslanger stated: "There is a presumption of regularity that accompanies the filing of documents that are accepted by the Clerk, the Clerk's review thereof and issuance of a judgment."

98.    Nowhere in the Affirmation does Houslanger disclose that the judgment at issue was part of a certified class action in federal court in which the original judgment creditor had agreed that each and every judgment debtor was entitled to interpose a defense such as fraud, misrepresentation, illegality, unconscionability, or lack of due service.

99.    These statements and omissions are deceptive in light of the findings made by the federal district court in the *Sykes* litigation, the *Sykes* settlement, and the filings of the Attorney General in the 5015(c) proceeding.

100.    On or about June 2, 2017, the Court granted Mr. Sander's Order to Show Cause, vacated the judgment and dismissed the case.  However, due to an administrative error, the motion was marked as adjourned and a new court date was set, which Mr. Sanders missed, causing the judgment to persist in the court's records.

101.    On October 19, 2017, Mr. Sanders applied for a second Order to Show Cause, again without legal counsel.

102.    The Houslanger Firm filed a *second* affirmation in opposition to Mr. Sanders' October 19, 2017 Order to Show Cause that contained the same deceptive statements and omissions as contained in the original April 21, 2017 Affirmation.

103.    On November 6, 2017, the court vacated the default judgment and restored the case to the trial calendar and adjourned it for April 10, 2018.

104.    According to Houslanger's Affirmation, one payment of $27.49 was garnished from Mr. Sanders' paycheck. In addition, Mr. Sanders spent money trying to stop the collection activity, including postage, envelopes, copying costs, and transportation costs.

105.    Mr. Sanders also missed more than a week of work attending court on multiple occasions and otherwise investigating the Houslanger Defendants to determine whether it was operating a scam.

106.    Mr. Sanders has also suffered emotional distress, stress and anxiety from these incidents.

### *Antero Sarreal*

107.    Plaintiff Antero Sarreal is 76 years old and a resident of Queens, New York.  He is a retired physician, and his only income is Social Security retirement benefits.

108.    On August 3, 2006, LR Credit 10 obtained a judgment against Mr. Sarreal in the amount of $7973.19.

109.    Mr. Sarreal was never served with any documents in the case and had no notice of the lawsuit or judgment until May 2017, when the Houslanger Defendants froze his bank account.

110.    Process server Angelo Rivera of Samserv filed an Affidavit of Service falsely stating that he had served Mr. Sarreal on May 9, 2006, by delivering a copy of the summons and complaint to an "Ana Sarreal" at 248 Granite Ave., Apt. 1a, Staten Island, NY 10303, and by later mailing the court papers to him.

111.    On the date of alleged service, Mr. Sarreal did not reside at 248 Granite Ave., or even in Staten Island.  He had moved from that address in 1999, when he separated from his wife, who is now deceased.

112.    He also does not know anyone named "Ana Sarreal" or anyone fitting the process server's description of the alleged "Ana Sarreal."

113.    Furthermore, the affidavit of service claims service at 248 Granite Ave. "Apartment 1a.," but no such address exists. 248 Granite Ave. is a private house.

114.    After Mr. Sarreal did not appear in court, LR Credit moved for a default judgment, supported by an affidavit of merit signed by Todd Fabacher. In the affidavit, Fabacher falsely claimed personal knowledge that Mr. Sarreal owed a debt to Sears.

115.    Mr. Sarreal did have a Sears account many decades ago, but he stopped using it in the late 1970s. He has not used any credit cards in nearly 30 years.

116.    LR Credit's records list Mr. Sarreal's alleged debt as sold to "Sherman" on October, 15, 2007.

117.    Sherman has since sold Mr. Sarreal's alleged debt to another debt buyer.

118.    According to the documents the Houslanger Firm submitted to Mr. Sarreal's bank to freeze his account, his LR Credit judgment is now owned by Defendant Aquarius.

119.    Neither LR Credit, Mel Harris, Sherman, the Houslanger Firm, nor any other party has ever notified Mr. Sarreal of the sale or assignment of the judgment.

120.    The records of the New York City Civil Court still list Mr. Sarreal's judgment as owned by LR Credit and the attorney as the Mel Harris Firm.

121.    In May 2017, Mr. Sarreal discovered that the Houslanger Defendants had frozen his bank accounts.

122.    Mr. Sarreal telephoned the Houslanger Firm and spoke to someone named Kristen Vogler. Ms. Vogler stated that his accounts were frozen because of a Sears debt. Mr. Sarreal informed Ms. Vogler that his only income was from Social Security. Ms. Vogler stated that she

wanted to send him some papers. Because Mr. Sarreal does not use email or have a fax machine, he asked her to send the papers to his son.

123.    Mr. Sarreal then telephoned Sears.  A Sears representative stated that they had no record of an account in his name.

124.    Mr. Sarreal subsequently reviewed the papers Ms. Vogler sent to his son. Ms. Vogler had sent an "Agreement Settling Judgment" and a "Conditional Release." These documents purported to waive all Mr. Sarreal's defenses and "settle" the judgment for an immediate payment of $1,784.56 from Mr. Sarreal's bank account.

125.    Both documents refer to "LR Credit 10, LLC Assignee of: Sears" as Plaintiff and identify the Houslanger Firm as attorney for the "Judgment Creditor."

126.    However, by May 2017, LR Credit was defunct and the Houslanger Firm did not represent LR Credit.  Rather, the Houslanger Firm represented a different company.  It did not disclose in the papers it provided to Mr. Sarreal which company it represented.   According to the papers the Houslanger Firm provided to Mr. Sarreal's bank, the Houslanger Firm represented Aquarius.

127.    The Agreement Settling Judgment also stated that Mr. Sarreal gave "permission to any party related to this action to call [my] cell phone in regards to this debt."

128.    Mr. Sarreal did not sign either the Agreement Settling Judgment or the Conditional Release.

129.    Instead, Mr. Sarreal went to the Richmond County Civil Court, where he filed an Order to Show Cause seeking to vacate the default judgment, release his bank accounts, and dismiss the case.

130.    On July 19, 2017, the court issued an order releasing Mr. Sarreal's bank accounts.

131.    On September 12, 2017, the court issued an order vacating the judgment and dismissing the case.

132.    Mr. Sarreal has suffered a great deal of emotional distress from this incident. Aside from the stress of having his bank accounts frozen, at a basic level he struggled to understand who was collecting from him. He remains upset that Houslanger has been so persistent in seeking to collect a fraudulently obtained judgment on a debt he does not owe, and further that Houslanger tried to trick him into waiving all his defenses and paying this fraudulent debt from his exempt Social Security income.

133.    Furthermore, from May to November 2017, Kristin Vogler from the Houslanger Firm called Mr. Sarreal's cell phone repeatedly despite having no permission to do so. Mr. Sarreal found these repeated unwanted and illegal phone calls extremely harassing and disturbing.

## CLASS ACTION ALLEGATIONS

134.    Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23 on behalf of a class consisting of: All persons with Sold Judgments placed with the Houslanger Firm for collection where the Houslanger Defendants have collected or attempted to collect the Sold Judgments.

135.    Joinder of all members is impracticable.

136.    There are questions of law and fact common to all of the Classes that predominate over questions affecting only individual members, including but not limited to:

a.    Whether Defendants are "debt collectors" under the FDCPA;

b.    Whether Defendants violated the FDCPA by making false and deceptive statements and engaging in unfair practices while collecting the Sold Judgments;

    c.   Whether Defendants violated the FDCPA by enforcing judgments they knew or reasonably should have known to be fraudulent;

    d.   Whether Defendants violated the FDCPA by enforcing the judgments without first providing actual notice to Defendants of the assignment of the judgments;

    e.   Whether the Houslanger Defendants violated the FDCPA by enforcing the judgments without conducting a meaningful attorney review to determine whether the judgments were entered based on false affidavits of merit, false affidavits of service, and/or whether the judgment debtors received actual notice of the assignments.

    f.   Whether Defendants' conduct was "consumer-oriented" under the GBL;

    g.   Whether the Defendants violated GBL 349 by collecting judgments they know or reasonably should have known to be fraudulent;

    h.   Whether the Houslanger Defendants violated the FDCPA and GBL 349 by filing deceptive and misleading affirmations in opposition to orders to show cause;

    i.   Whether Houslanger violated the Judiciary Law by filing affirmations in opposition that constituted deceit and collusion, or consent to deceit and collusion, with intent to deceive the court and the *Sykes* class members as to the nature of the Sold Judgments and the circumstances under which the Sold Judgments were obtained.

137.   The claims of the class representatives will advance the interests of the absent class members.  The class representatives will fairly and adequately protect the interests of the class.

138.    There are no conflicts of interest between the class representatives and the class

members, and the class members will vigorously prosecute this action on behalf of the class.

139.    A class action is superior to the other available methods for the fair and efficient

adjudication of this controversy.

## FIRST CAUSE OF ACTION
### (FDCPA)

140.    Congress enacted the FDCPA to stop "the use of abusive, deceptive and unfair

debt collection practices by many debt collectors." 15 U.S.C. § 1692a.

141.    A debt collector may not "use any false, deceptive, or misleading

misrepresentation or means in connection with the collection of any debt." § 1692e. Such

prohibition includes the false representation of "the character, amount, or legal status of any

debt," § 1692e(2)(A); the false representation "that any communication is from an attorney," §

1692e(3); the representation that nonpayment will result in the "seizure, garnishment,

attachment, or sale of any property or wages of any person unless such action is lawful," §

1692e(4); the "threat to take any action that cannot legally be taken," § 1692e(5); and "the use of

any false representation or deceptive means to collect or attempt to collect any debt," §

1692e(10).

142.    A debt collector likewise may not "use unfair or unconscionable means to collect

or attempt to collect any debt." § 1692f.

143.    Defendants violated the FDCPA by making false and misleading

misrepresentations and engaging in unfair and unconscionable practices.  Defendants' violations

include, but are not limited to:

a. Enforcing judgments that Defendants knew or reasonably should have known were obtained by fraud, including by freezing people's bank accounts and garnishing their wages;

b. Making false and deceptive representations to the New York State courts, New York City Marshals, and county sheriffs that the Sold Judgments were just as legitimate and trustworthy as other judgments;

c. Collecting and attempting to collect the Sold Judgments without providing actual notice of the assignments to the judgment debtors;

d. Collecting and attempting to collect the Sold Judgments without conducting a meaningful attorney review of the files to determine whether the judgments were entered based on false affidavits of merit, false affidavits of service, and/or whether the judgment debtors received actual notice of the assignments.

## SECOND CAUSE OF ACTION
### (GBL 349)

144.   New York prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state. . . ." N.Y. Gen. Bus. Law § 349(a).

145.   Defendants violated GBL 349 by using deceptive acts and practices in the conduct of their business.  Specifically, Defendants engaged in deceptive acts and practices by and while enforcing and collecting on the Sold Judgments.

146.   Defendants' conduct has a broad impact on consumers at large.

147.   Defendants committed the above-described acts willfully and/or knowingly.

25

148.    Defendants' deceptive acts and practices have caused injury and damages to Plaintiffs and class members.

149.    Plaintiffs seek actual and statutory damages in an amount to be proven at trial, along with costs and reasonable attorneys' fees.

## THIRD CAUSE OF ACTION
### (JL 487)

150.    New York law states that "an attorney or counsel who . . . is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party . . . [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law . . . forfeits to the party injured treble damages, to be recovered in a civil action." N.Y. Jud. Law § 487(1).

151.    As described above, by filing deceptive and misleading affirmations in opposition to vacatur of the Sold Judgments, Defendant Houslanger engaged in deceit or collusion, or consented to deceit and collusion, with the intention to deceive courts and opposing parties.

152.    Defendant Houslanger committed these acts willfully and/or knowingly.

153.    Defendant Houslanger's deceitful acts have caused injury and damages to Plaintiffs and class members.

154.    Plaintiffs seek actual and treble damages in an amount to be proven at trial.

## JURY DEMAND

155.    Plaintiffs demand a jury trial.

## RELIEF

WHEREFORE, Plaintiffs seek as follows:

(a)    Certification of this action as a class action pursuant to Fed. R. Civ. P. 23;

(b)    Actual and/or compensatory damages in an amount to be proven at trial;

26

(c)     Statutory damages pursuant to the FDCPA and GBL 349;

(d)     Treble damages pursuant to JL 487;

(e)     An award of attorneys' fees and costs pursuant to GBL 349 and the FDCPA; and,

(f)     Granting such other and further relief as this Court deems just and proper.


Dated:        November 16, 2017
              New York, New York


                                   EMERY CELLI BRINCKERHOFF
                                   & ABADY LLP

                                   By: ___/s/ Matthew Brinckerhoff
                                   Matthew D. Brinckerhoff
                                   Debra L. Greenberger
                                   Elizabeth S. Saylor
                                   600 Fifth Avenue, 10th Floor
                                   New York, New York 10020
                                   212-763-5000

                                   MOBILIZATION FOR JUSTICE
                                   Carolyn E. Coffey and
                                   Ariana Lindermayer, of counsel to
                                   Jeanette Zelhof
                                   100 William St., 6th Fl.
                                   New York, NY 10038
                                   212-417-3701

                                   NATIONAL CENTER FOR LAW AND
                                   ECONOMIC JUSTICE
                                   Claudia Wilner
                                   275 Seventh Avenue, Suite 1506
                                   New York, NY 10001-6708
                                   212-633-6967

                                   NEW ECONOMY PROJECT
                                   Susan Shin
                                   121 W 27th Street, Suite 804
                                   New York, NY 10001
                                   212-680-5100

27

*Attorneys for Ramel Sanders, Antero Sarreal
and the Putative Class*

28